# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _22-cr-80080-Cannon/Reinhart_

18 U.S.C. § 1349
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

v.

ACCELOGIC LLC and
INTELLECTUAL PROPERTY SYSTEMS, LLC,
a/k/a "Intellep,"

   Defendants.

_____/

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times material to this Information:

1.     Accelogic LLC ("ACCELOGIC") was a limited liability company located in Broward County, Florida, in the Southern District of Florida, that was owned and operated by Juan Guillermo Gonzalez ("Gonzalez") and Ana Beatriz Hernandez ("Hernandez").

2.     Intellectual Property Systems, LLC, a/k/a "Intellep" ("INTELLEP") was a limited liability company located in Broward County, Florida, in the Southern District of Florida, that was owned and operated by Juan Guillermo Gonzalez ("Gonzalez") and Ana Beatriz Hernandez ("Hernandez").

3.      Both ACCELOGIC and INTELLEP were originally organized in the State of Delaware, but during all times material to this Information, their principal offices were located in Broward County, Florida, in the Southern District of Florida, and, in 2017, they filed Articles of Conversion to convert from Delaware limited liability companies to Florida limited liability companies.

4.      The Missile Defense Agency, the United States Air Force, the United States Army, and the Defense Advanced Research Projects Agency ("DARPA") were military services of the United States under the Department of Defense.

5.      The Department of Energy and the National Aeronautics and Space Administration ("NASA") were agencies of the United States.

## The Small Business Innovation Research Program

6.      The Small Business Innovation Research (SBIR) Program was established by Congress in 1982 to provide increased opportunities for domestic small businesses to participate in research and development to increase employment and to improve competitiveness in the United States.  The intended purpose of the SBIR program was to encourage small U.S. businesses to engage in federal Research and Development (R&D) that had potential for commercialization. Through a competitive awards-based program, the SBIR program enabled small U.S. businesses to explore their technological potential and provided the incentive to profit from its commercialization, while the United States gained entrepreneurial spirit as it met its specific research and development needs.   Awards were coordinated through the Small Business Administration.

7.      The SBIR program's mission was to stimulate technological innovation in the private sector, to strengthen the role of small businesses to meet R&D needs, to foster and

2

encourage participation in innovation and entrepreneurship by socially and economically disadvantaged persons, and to increase private-sector commercialization of innovations derived from funding for R&D by the federal government.

8.     The SBIR program was comprised of three development phases that could be awarded. Phase I was a study to evaluate the scientific and technical merit of the idea, and generally extended one year in duration, with a current maximum award of $275,766 (this has been increased from a previous maximum of $100,000). Phase II expanded on the research results of Phase I, and typically extended two years in duration, with a current maximum award of $1,838,436 (this has been increased from a maximum of $750,000). Phase III was for the commercialization of the results of Phase II and required the participation of private-sector or non-SBIR Federal funding.

9.     The SBIR program reimbursed for direct labor, direct costs, subcontractors/consultants, overhead, and general and administrative (G&A) costs that were included in an applicant's proposed budget. In addition, a reasonable fee or profit was available to the company receiving the award under the SBIR; however, there was a requirement that this fee be included in the budget request, approved by the agencies participating in the SBIR Program, and normally would not exceed 7% of total costs for each phase of the project. The profit was intended to be a reasonable profit factor consistent with normal profit margins provided to profit-making firms for R&D work.

10.    Eleven federal agencies participated in the SBIR program, including the Department of Energy, NASA, and the Department of Defense (with its component agencies the United States Army, DARPA, and the Missile Defense Agency). Each year, the agencies and departments within the SBIR program issued solicitations for research proposals. In addition to

3

describing the type of research that the agencies and departments were seeking, the solicitations described the basic rules of the SBIR program, including, amongst others, the requirements that: (a) the business be organized for profit, with a place of business located in the United States; (b) the business must be more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States or by other small business concerns that are each more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States; (c) the business have no more than 500 employees; and (d) the R&D occur inside the United States.

11.     Under the solicitations, U.S.-owned small businesses could electronically submit proposals for review to the soliciting SBIR agencies. Proposals outlined the research that would be conducted and the key personnel who would conduct the research. Proposals also had to include a section identifying the proposed research budget, including all costs (direct and indirect labor, overhead, materials/equipment, and travel) and a Budget Summary that explained allocation of the requested funds to enable the government agency to determine whether the proposed budget was fair and reasonable. Proposals also had to discuss the business's strategy for commercialization; other sources of funding; the location and specifics of the facility and equipment the business would utilize to complete the project; the qualifications of the personnel performing the R&D; and the qualifications and roles of any subcontractors or consultants involved in the project.

12.     Proposals also would include letters of commitment from the consultants and subcontractors listed in the proposals, confirming their availability and willingness to conduct the R&D and listing their rates.

13.     Proposals also could include letters of support and/or endorsements received by the business for the research project from commercial entities or individuals that would provide monetary or in-kind investments to the project in the event the grant or contract was awarded.

**The Small Business Technology Transfer Program**

14.     The Small Business Technology Transfer (STTR) Program also was established by Congress in pursuit of the same goals and with one additional intended purpose – to foster technology transfer through cooperative R&D between small businesses and non-profit research institutions.  Like the SBIR program, the STTR program was also a competitive awards-based program, and awards were coordinated through the Small Business Administration.

15.     The STTR program's mission was to build partnerships between small businesses and non-profit research institutions.  The STTR program required the small business to formally collaborate with a research institution in Phase I and Phase II.  STTR's most important role was to bridge the gap between performance of basic science and commercialization of resulting innovations.

16.     Five federal agencies participated in the STTR program, including the Department of Energy, NASA, and the Department of Defense (with its component agencies, including the United States Air Force, the United States Army, DARPA, and the Missile Defense Agency).  Each year, the agencies and departments within the STTR program issued solicitations for research proposals.  In addition to describing the type of research that the agencies and departments were seeking, the solicitations described the basic rules of the STTR program.   The requirements included that: (a) the business be organized for profit, with a place of business located in the United States; (b) the business must be more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States or by other small business

5

concerns that are each more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States; (c) the business have no more than 500 employees; (d) the R&D occur inside the United States; (e) the business must partner with a non-profit research institution; and (f) at least 40% of the R&D must be performed by the business and at least 30% of the work must be performed by the research institution.

17.     Under the solicitations, U.S.-owned small businesses could electronically submit proposals for review to the soliciting STTR agencies.  Proposals outlined the research that would be conducted and the key personnel who would conduct the research, including the allocation of R&D between the business and the non-profit research institution.  Proposals also had to include a section identifying the proposed research budget, including all costs (direct and indirect labor, overhead, materials/equipment, and travel) and a Budget Summary that explained allocation of the requested funds to enable the government agency to determine whether the proposed budget was fair and reasonable.  Proposals also had to discuss the business's strategy for commercialization; other sources of funding; the location and specifics of the facility and equipment the business would utilize to complete the project; the qualifications of the personnel performing the R&D; and the qualifications and roles of any subcontractors or consultants involved in the project.

18.     Proposals also would include letters of commitment from the consultants and subcontractors listed in the proposals, confirming their availability and willingness to conduct the R&D and listing their rates.

19.     Proposals also could include letters of support and/or endorsements received by the business for the research project from commercial entities or individuals that would provide monetary or in-kind investments to the project in the event the grant or contract was awarded.

20.    The STTR program also reimbursed for direct labor, direct costs, subcontractors/consultants, overhead, and general and administrative (G&A) costs that were included in an applicant's proposed budget.  STTR award recipients were also entitled to receive a profit, so long as that profit was set forth in the proposal and generally did not exceed 7% of the project.

### Factors in Evaluating Proposals and Awarding Contracts and Grants

21.    When evaluating SBIR and STTR proposals, evaluators considered: (1) the soundness, technical merit, and innovation of the proposed approach and its incremental progress toward the topic under consideration; (2) the qualifications of the proposed/key investigators, supporting staff, and consultants, including not only the ability to perform the research and development, but also the ability to commercialize the results; and (3) the potential for commercial application (which could include intra-government application) and benefits expected to accrue from this commercialization.

22.    The awards of the proposals were made by a panel of reviewers, typically comprised of scientists and subject matter experts in various scientific and engineering fields. Based on the panel's ratings in the three categories listed in the preceding paragraph, an official of the soliciting agency made the final award decisions.  In reviewing and evaluating these proposals, the panel and the soliciting agency official relied on the truthfulness and accuracy of the information contained in the proposals as a basis of awarding the contracts. The scoring difference between the applications could be as small as fractions of a point in some instances.

23.    Once a proposal was selected and funded for a project by the awarding government agency, the proposal, which included the budget summary, typically became incorporated into the contract/grant and was used as the statement of work.  In addition, a formal contract or grant was

signed, setting forth formal terms and conditions for performance and payment, including, amongst other items, restating the requirements that work be performed in the United States by U.S. persons, confidentiality requirements, and performance deadlines. The document was signed by the small business and by a government employee.

24.     In the submission of the proposals, the business was required to certify that all the information included was true and accurate, or to acknowledge, either electronically or in writing, that the small business understood that providing false information in the proposals was a criminal offense. The certifications and acknowledgements included the information regarding the budget summary, labor hours, and the personnel and consultants who would be devoted to the contract.

25.     Once the contract/grant was awarded, in order to receive payment for work done on a project, the small business was required to request progress payments from the government agency by submitting electronically contractor invoices and government approved forms. On those forms, the small business again had to certify that it understood that willfully providing false information or concealment of a material fact in its submissions was a criminal offense.

### Florida Research Commercialization Matching Grant Program

26.     The Florida Institute for the Commercialization of Public Research (Florida Institute) was founded in Boca Raton, Florida, in 2007 as a non-profit organization for investors and entrepreneurs located in Florida who sought to identify new opportunities based on technologies through publicly-funded research.

27.     On October 11, 2010, the Florida Institute announced the launch of the Florida Research Commercialization Matching Grant Program, which was designed to increase federal funding to Florida technology companies. The Matching Grant Program was established by Florida's Office of Tourism, Trade and Economic Development and Enterprise Florida to be

administered by the Florida Institute. The Matching Grant Program provided one-time awards of up to $50,000 for Phase I and up to $250,000 for Phase II grants for applicants who had previously received Federal SBIR or STTR Phase I or Phase II awards. The Matching Grant Program was designed to be a catalyst for small or start-up companies that could take advantage of federal and state grant funding in order to accelerate their growth and market penetration by helping to overcome the funding gap faced by many small companies.

28.     To be eligible, the small Florida company needed to have been awarded a Phase I SBIR or STTR grant/contract after January 1, 2010 or a Phase II SBIR or STTR grant/contract after January 1, 2009 and have an active SBIR/STTR project underway.

29.     On January 20, 2011, the Florida Institute announced that Accelogic was one of 11 Florida businesses to be awarded one of the first Matching Grants. Thereafter, Accelogic electronically submitted reports and correspondence to the Florida Institute's offices in Boca Raton.

## COUNT ONE

30.     The General Allegations set forth in paragraphs 1 through 29 of this Information are re-alleged and incorporated by reference as though fully set forth herein.

31.     In or around 2006, the exact date being unknown to the United States Attorney, and continuing through the present, in Palm Beach and Broward Counties, in the Southern District of Florida, and elsewhere, the defendants,

**ACCELOGIC LLC,**
**and**
**INTELLECTUAL PROPERTY SYSTEMS, LLC,**
**a/k/a "Intellep,"**

did willfully, that is, with intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and with others known and unknown to commit

wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and, for the purpose of executing such scheme, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds; in violation of Title 18, United States Code, Section 1343.

## Object of the Conspiracy

32.     It was the object of the conspiracy for the conspirators to unlawfully enrich themselves by, among other things: (a) obtaining SBIR and STTR awards and a Florida matching grant based on materially false and fraudulent pretenses, representations, and promises; (b) using non-U.S. persons to perform the contracts; (c) performing R&D outside the United States; (d) failing to use promised subject-area experts and consultants; (e) submitting invoices and certifications falsely stating that work was performed in accordance with the terms of the SBIR and STTR contracts and grants and the Florida matching grant; and (f) distributing the fraud proceeds among themselves and their owners for their personal use and benefits, the use and benefit of others, and to further the fraud.

## The Manner and Means of the Conspiracy

33.     Beginning in or around May 2005 and continuing through January 2019, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to submit by wire transmission proposals for 43 SBIR or STTR awards and to apply for a Florida Research Commercialization Matching Grant, resulting in the award of 26 grants or contracts. All of the awarded SBIR and STTR proposals, and the Florida Research Commercialization Matching Grant application, contained materially false and fraudulent representations.

34.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent in proposals and applications that it had put together a world-class team of outside consultants who would work with ACCELOGIC to achieve the results stated in the work plan within the time constraints listed, and to budget substantial amounts for those consultants.  In truth and in fact, ACCELOGIC did not intend to have those consultants perform any substantive work on the contracts and, instead, planned to keep the budgeted funds as profits in excess of the 7% profit allowed under the SBIR/STTR programs, which resulted in substantial time overruns.

35.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent in proposals and applications that ACCELOGIC would use a number of employees identified only by job title, for example, "software coder," and to budget substantial amounts for those unidentified employees.  In truth and in fact, ACCELOGIC did not have those employees and did not intend to hire those employees and, instead, planned to have the work performed by employees who were already named in the contracts, and keep the budgeted funds as profits in excess of the 7% profit allowed under the SBIR/STTR programs, which resulted in substantial time overruns.

36.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent in proposals and applications that all R&D work would be performed in the United States by "U.S. persons" when in truth and in fact R&D work was performed outside the United States and was performed inside the United States by non-U.S. persons even when specifically objected to by the contracting agency.

37.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent in a proposal and certifications that Stanford

University served as its non-profit research institution partner on the Phase II STTR program contract with the Air Force. In truth and in fact, ACCELOGIC failed to use Stanford University to do any R&D work on that Phase II contract, yet it submitted certifications stating that the work was performed in accordance with the terms of the contract and collected the full amount of the contracted funds.

38.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent in proposals and applications that ACCELOGIC had significant independent sources of private funding for its research, in addition to the government funding for which ACCELOGIC was applying. In truth and in fact, ACCELOGIC received no significant independent private funding for its research.

39.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to misrepresent its ability to commercialize its products, including by overstating the number of patents it had obtained, the number of persons it employed, and the amount of commercial sales it had made, in order to increase the likelihood of receiving an SBIR award.

40.     Among other sources of private funding, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to falsely and fraudulently represent that INTELLEP intended to provide millions of dollars in private funding for ACCELOGIC's research. In order to create the appearance that INTELLEP was providing such funding, the members of the conspiracy caused ACCELOGIC to surreptitiously transfer funds obtained from government grants from ACCELOGIC's bank accounts via intermediate sources to INTELLEP's bank accounts, and then caused INTELLEP to transfer those same funds back to ACCELOGIC. INTELLEP had no significant source of income other than the funds it received from ACCELOGIC via other members of the conspiracy.

41.     Among other things, ACCELOGIC, INTELLEP, and their co-conspirators caused INTELLEP to create letters of support for ACCELOGIC stating that INTELLEP Board members held meetings and voted to commit funds to financially support ACCELOGIC when, in truth and in fact, no such meetings had occurred, and the letters were written and signed by co-conspirators solely to further the conspiracy.

42.     After being awarded the SBIR and STTR grants and contracts, ACCELOGIC, INTELLEP, and their co-conspirators caused ACCELOGIC to perform the contracts and grants in violation of their terms, and thereafter caused ACCELOGIC to submit by wire transmission certifications and invoices containing materially false and fraudulent statements that the work had been performed in the United States by U.S. persons and performed consistent with the terms of the contracts and grants.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

1.     The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which any of the defendants, ACCELOGIC LLC, and INTELLECTUAL PROPERTY SYSTEMS, LLC, a/k/a "Intellep," have an interest.

2.     Upon conviction of a conspiracy to commit a violation of Title 18, United States Code, Section 1343, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived, from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

3.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c).

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO. 22-cr-80080-Cannon/Reinhart

v.

ACCELOGIC LLC and INTELLECTUAL
PROPERTY SYSTEMS, LLC, a/k/a "Intellep,"

**CERTIFICATE OF TRIAL ATTORNEY***

**Superseding Case Information:**

_____ Defendants/

Court Division: (Select One)

☐ Miami  ☐ Key West  ☐ FTL
☑ WPB   ☐ FTP

New defendant(s)  ☐ Yes  ☐ No
Number of new defendants  _____
Total number of counts  _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:  (Yes or No) **No** _____
   List language and/or dialect _____

4. This case will take __30__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I    0 to 5 days     ☐
   II   6 to 10 days    ☐
   III  11 to 20 days   ☐
   IV   21 to 60 days   ☑
   V    61 days and over ☐

   (Check only one)
   Petty        ☐
   Minor        ☐
   Misdemeanor  ☐
   Felony       ☑

6. Has this case previously been filed in this District Court?  (Yes or No) **No** _____
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?  (Yes or No) **No** _____
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case?  (Yes or No) **No** _____

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No** _____

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? (Yes or No) **No** _____

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No** _____

_____
A. MARIE VILLAFAÑA
Assistant United States Attorney
FLA Bar No.     0018255

REV 3/19/21

*Penalty Sheet(s) attached

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
| v. | ) | Case No. 22-cr-80080-Cannon/Reinhart |
| ACCELOGIC LLC | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Peter Zeidenberg, Esq.
*Printed name of defendant's attorney*

_____
*Judge's signature*

U.S. Magistrate Judge
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.  22-cr-80080-Cannon/Reinhart |
| INTELLECTUAL PROPERTY SYSTEMS, LLC, a/k/a | ) | |
| "Intellep," | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year.  I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

Peter Zeidenberg, Esq.
_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

U.S. Magistrate Judge
_____
*Judge's printed name and title*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### PENALTY SHEET

Defendant's Name:   ACCELOGIC LLC

Case No.: 22-cr-80080-Cannon/Reinhart

Count 1:

18 U.S.C. § 1349

Conspiracy to commit wire fraud

*Max. Penalty: At least 1 year up to a maximum of 5 years' Probation; Fine of the greater of $500,000 or twice the gross gain or gross loss; $400 special assessment

*Does not include possible restitution or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## PENALTY SHEET

Defendant's Name:   INTELLECTUAL PROPERTY SYSTEMS, LLC, a/k/a "Intellep"

Case No.:   22-cr-80080-Cannon/Reinhart

Count 1:

18 U.S.C. § 1349

Conspiracy to commit wire fraud

*Max. Penalty: At least 1 year up to a maximum of 5 years' Probation; Fine of the greater of

$500,000 or twice the gross gain or gross loss; $400 special assessment

**\*Does not include possible restitution or forfeitures that may be applicable.**