UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   22-CR-80080-CANNON/REINHART

UNITED STATES OF AMERICA

v.

ACCELOGIC LLC,

Defendant.

_____/

## PLEA AGREEMENT

The United States Attorney's Office for the Southern District of Florida ("this Office") and Accelogic LLC (hereinafter referred to as "Accelogic" or the "defendant"), through Accelogic's undersigned representative and attorney, and pursuant to authority granted by Accelogic's Members, enter into the following agreement:

1.      The defendant agrees to plead guilty to the Information, which charges that the defendant conspired with Intellectual Property Systems, LLC, a/k/a "Intellep," and persons known and unknown to commit wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349.

2.      The defendant agrees that this Agreement will be executed by an authorized corporate representative.  The defendant further agrees that a Resolution duly adopted by the Members of Accelogic, in the form attached to this Agreement as Exhibit B, or in a substantially similar form, represents that the signatures on this Agreement by Accelogic and its counsel are authorized by the Members of Accelogic.

1

3.      The defendant agrees and represents that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and the defendant agrees to abide by all terms and obligations of this Agreement as described herein.

4.      In consideration of the undertakings contained herein, this Office agrees that it will not pursue any additional charges related to the defendant's involvement in criminal activity in the Southern District of Florida that was the subject of this Office's investigation bearing USAO Numbers 2017R01152, 2022R00712, and 2022R00713.

5.      The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the Court's Probation Office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

6.      The defendant also understands and acknowledges that, as to the charge in the Information, the Court may impose a sentence of probation and/or a fine.  If the Court imposes a probationary sentence, it must impose a minimum term of one (1) year of probation, up to a maximum term of five (5) years of probation.  In addition to a term of probation, the Court may impose a fine of up to the greatest of $500,000, twice the gross pecuniary gain to the defendant, or twice the gross pecuniary loss to persons other than the defendant.  The defendant further understands and acknowledges that restitution is mandatory and it will be required to pay restitution to the victims of its offenses, which will be calculated by the Court's Probation Office at the time of sentencing.  Attached hereto as **Exhibit A** is the parties' good faith calculation of the restitution figure.  The defendant also understands and acknowledges that a violation of the terms of probation can result in additional criminal penalties.

7.      The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 6 of this Agreement, a special assessment in the amount of $400 will be imposed on the defendant.  The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

8.      The defendant understands and acknowledges that as a result of this plea, it may be excluded from future participation in government contracts and grants under the Small Business Innovative Research (SBIR) Program, the Small Business Technology Transfer (STTR) Program, and other federal programs.

9.      This Office reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background.  Subject only to the express terms of any agreed-upon sentencing recommendations

3

contained in this Agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

10.     This Office and the defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

a.     The defendant was not operated primarily for a criminal purpose or primarily by criminal means, so, pursuant to USSG § 8A1.2((b)(2), the Probation Office should apply USSG § 8C2.1 to determine the fine range.

b.     Pursuant to § 8A1.2(b)(2)(A), an abbreviated determination of the guideline fine range is warranted because the defendant is not likely to become able to pay restitution required under § 8B1.1 and forfeiture. Thus, pursuant to USSC § 8C2.2(a), a determination of the guideline fine range is unnecessary because, pursuant to USSC § 8C3.3(a), no fine would be imposed.

c.     pursuant to U.S.S.G. § 8D1.1(a)(1), (2), and (7), the parties will recommend that the Court impose a term of three (3) years' probation if: (i) the defendant and its co-defendant fail to pay full restitution at the time of sentencing; or (ii) the defendant is sentenced to pay a fine and the fine is not paid in full at the time of sentencing.

11.     As to the charge contained in the Information, the defendant agrees that Accelogic is jointly and severally responsible for restitution for losses caused by the conspiracy involving Accelogic in an amount to be determined by the Court's Probation Office. The parties agree that they will jointly recommend that the amount owed as restitution for Accelogic's fraud is **$2,902,984.98,** as set forth in Exhibit A, and that the restitution order should be entered jointly and severally with Intellectual Property Systems, LLC, a/k/a "Intellep," and Juan Guillermo Gonzalez.

12.     The defendant agrees to forfeit to the United States, voluntarily and immediately, any right, title, and interest to any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to 18 U.S.C. § 981(a)(1)(C).  The defendant agrees to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).  The property subject to forfeiture includes, but is not limited to:

> a.   a forfeiture money judgment in the sum of $2,902,984.98 in U.S. currency, which represents the value of the property subject to forfeiture.

13.     The defendant further agrees that forfeiture is independent of any assessment, fine, cost, restitution, or penalty that may be imposed by the Court. The defendant knowingly and voluntarily agrees to waive all constitutional, legal, and equitable defenses to the forfeiture, including excessive fines under the Eighth Amendment to the United States Constitution. In addition, the defendant agrees to waive: any applicable time limits for administrative or judicial forfeiture proceedings, the requirements of Fed. R. Crim. P. 32.2 and 43(a), and any appeal of the forfeiture.

14.     The defendant also agrees to fully and truthfully disclose the existence, nature and location of all assets in which the defendant has or had any direct or indirect financial interest or control, and any assets involved in the offense of conviction.  The defendant agrees to take all steps requested by the United States for the recovery and forfeiture of all assets identified by the United States as subject to forfeiture.  This includes, but is not limited to, the timely delivery upon request of all necessary and appropriate documentation to deliver good and marketable title,

consenting to all orders of forfeiture, and not contesting or impeding in any way with any criminal, civil or administrative forfeiture proceeding concerning the forfeiture.

15.     In furtherance of the satisfaction of restitution and a forfeiture money judgement entered by the Court in this case, the defendant agrees to the following:

a. submit a financial statement to this Office upon request, within 14 days calendar days of request;

b.   maintain any asset valued in excess of $10,000 and not sell, hide, waste, encumber, destroy or otherwise devalue such asset without prior approval of the United States;

c. provide information about any transfer of an asset valued in excess of $10,000 since the commencement of the offense conduct in this case to date;

d.   cooperate fully in the investigation and identification of assets, including liquidating assets, meeting with representatives of the United States, and providing any documentation requested; and

e. notify, within 30 days, the Clerk of the Court for the Southern District of Florida and this Office of: (i) any change of name, residence, or mailing address and (ii) any material change in economic circumstances.

16.     The defendant further understands that providing any false or incomplete information about assets, concealing assets, making materially false statements or representations, or making or using false documents or writings pertaining to assets, taking any action that would impede the forfeiture of assets, or failing to cooperate fully in the investigation and identification of assets may be used as a basis for: (i) separate prosecution, including under 18 U.S.C. §1001; or (ii) recommendation of a denial of reduction for acceptance of responsibility pursuant to the United States Sentencing Guidelines § 3E1.1.

17.     The defendant knowingly and voluntarily agrees to waive any claim or defense the defendant may have under the Eighth Amendment to the United States Constitution, including any claim of excessive fine or penalty with respect to any order of fine, forfeiture or restitution.

18.     Limitation on Joint Sentencing Recommendations: The defendant understands and agrees that this Office will not be required to make the sentencing recommendations set forth in paragraph (10) if the defendant: (a) fails or refuses to make a full, accurate and complete disclosure to the Probation Office of the circumstances surrounding the relevant offense conduct; (b) is found to have misrepresented facts to this Office prior to entering this plea agreement that were relied upon by this Office in reaching this agreement; (c) breaches any term of this agreement; or (d) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, or making false statements or misrepresentations to any governmental entity or official, including making any false statement to the Court. The defendant further understands and acknowledges that the Court is under no obligation to accept any of this Office's or the parties' joint sentencing recommendations.

19.     Penalties for Violation of Plea Agreement: Should the defendant violate the terms of this plea agreement by committing any additional crimes or giving false, incomplete, or misleading information or testimony, or by incriminating any innocent person, or by otherwise violating any terms or provisions of this Agreement including the waiver of the right to appeal, then this Agreement shall be void and the defendant shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including substantive wire fraud, money laundering, and other charges, and the defendant will have no right to vacate its plea of guilty to the charge contained in the Information. The defendant further waives any claim that such prosecution is time-barred where the statute of limitations – as extended by the parties' Sixth

Extension of Statute of Limitations Tolling Agreement – has expired between the signing of this agreement and the commencement of any such prosecution.

20.     The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the Probation Office, is a prediction, not a promise, and is not binding on this Office, the Probation Office, or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court, and the Court may disregard the recommendation in its entirety. The defendant acknowledges that no one has promised or guaranteed what sentence the Court will impose. The defendant understands and acknowledges, as previously acknowledged in paragraph (5) above, that the defendant may not withdraw its plea based upon (a) the Court's decision not to accept a sentencing recommendation made by the defendant and/or this Office, or (b) the fact that it received an incorrect estimate of the sentence that it would receive, whether that estimate came from its attorney, this Office, and/or the Probation Office.

21.     The defendant agrees that it has entered into this Plea Agreement freely and voluntarily, and that no threats or promises, other than the promises contained in this written Plea Agreement, were made to induce the defendant to enter its plea of guilty.

22.     The defendant is aware that Title 18, United States Code, Section 3742 and Title 28, United States Code, Section 1291 afford the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by this Office in this plea agreement, the defendant hereby waives all rights conferred by Sections 3742 and 1291 to appeal any sentence imposed, including any restitution or forfeiture order, or to appeal the manner

in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or an upward variance from the advisory guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b) and Title 28, United States Code, Section 1291. However, if the United States appeals the defendant's sentence pursuant to Section 3742(b) and 1291, the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that it has discussed the appeal waiver set forth in this agreement with its attorney. The defendant further agrees, together with the United States, to request that the Court enter a specific finding that the defendant's waiver of its right to appeal the sentence to be imposed in this case was knowing and voluntary.

23.     This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 6/22/2022                    By: _____
                                   A. MARIE VILLAFAÑA
                                   ASSISTANT UNITED STATES ATTORNEY

FOR ACCELOGIC LLC:

Date: 6/22/2022                    By: _____
                                   ANA BEATRIZ HERNANDEZ
                                   MANAGING MEMBER
                                   ACCELOGIC LLC

Date: 6/22/22                      By: _____
                                   PETER ZEIDENBERG, ESQ.
                                   ATTORNEY FOR DEFENDANT

9

## COMPANY OFFICER'S CERTIFICATE

I have read this Plea Agreement and carefully reviewed every part of it with outside counsel for Accelogic LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Members of the Company. I have advised and caused outside counsel for the Company to advise the Members fully of the right of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises of inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am a Managing Member of the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

FOR ACCELOGIC LLC:

Date: 6/22/2022          By: _____
ANA BEATRIZ HERNANDEZ
MANAGING MEMBER
ACCELOGIC LLC

## CERTIFICATE OF COUNSEL

I am counsel for Accelogic LLC (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's Members.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the Members of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Members, is an informed and voluntary one.

Date: 6/22/22

By: _____
PETER ZEIDENBERG, ESQ.
ATTORNEY FOR ACCELOGIC LLC

## **GOOD FAITH ESTIMATE OF RESTITUTION**

| AGENCY | CONTRACT NUMBER | AMOUNT |
|---|---|---|
| Air Force | FA9550-09-C-0052 | $749,996.00 |
| Army | W911W6-16-C-0007 | $149,992.81 |
| Army | W911W6-17-C-0026 | $249,994.18 |
| DARPA | D17PC00012 | $796,666.67 |
| DOE | DE-SC0018521 (Ph I) | $153,218.00 |
| MDA | HQ014718C7211 | $99,992.32 |
| NASA | NNX16CA11C | $703,125.00 |
| | **TOTAL** | **$2,902,984.98** |

EXHIBIT A

## RESOLUTION OF THE MEMBERS OF ACCELOGIC LLC

At a duly held meeting on ~~May~~ June 1, 2022, the Members of Accelogic LLC ("Accelogic" or the "Company") resolved as follows:

**WHEREAS**, the Company has been engaged in discussions with the United States Attorney's Office for the Southern District of Florida (the "Office") regarding certain issues arising out of, in connection with, or otherwise relating to the conduct of Accelogic's work with various federal agencies under the Small Business Innovation Research (SBIR) and Small Business Technology Transfer (STTR) programs;

**WHEREAS**, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Office; and

**WHEREAS**, the Company's outside counsel has advised the Members of the Company regarding its rights, possible defenses, and the consequences of entering into such agreement with the Office;

The Members hereby **RESOLVE** that:

1. The Company (i) consents to the filing in the United States District Court for the Southern District of Florida of an Information charging the Company with one count of **participating in a wire fraud conspiracy in violation of 18 U.S.C. § 1349 in connection with the conduct of its submission of research grant and contract proposals as set forth more fully in the Information,** and (ii) agrees to the execution of the Plea Agreement described in paragraph 2 below and to execute the obligations described therein;

2. Managing Member Ana Beatriz Hernandez, or her delegate, hereby is authorized on behalf of the Company to execute the Plea Agreement substantially in such form as reviewed by the Members at this meeting with such changes as the Attorney for Accelogic, or his delegate, may approve;

3. The Members hereby authorize, empower and direct Managing Member Ana Beatriz Hernandez, or her delegate, to take any and all actions as may be necessary or appropriate, and to approve and execute the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions, including to make any appropriate changes to the Company's regulations; and

4. All of the actions of Managing Member Ana Beatriz Hernandez, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

**IN WITNESS WHEREOF**, the Members of the Company has executed this Resolution effective as of the day and year first above written.

_____

Company Secretary

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 22-CR-80080-CANNON/REINHART


UNITED STATES OF AMERICA

vs.

ACCELOGIC LLC,

   Defendant.
_____/


## FACTUAL PROFFER

Defendant Accelogic LLC ("ACCELOGIC" or "Defendant"), through ACCELOGIC's undersigned representative and pursuant to authority granted by ACCELOGIC's Members through its Operating Agreement; Defendant's counsel; and the United States Attorney's Office stipulate and agree that, if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and that the following facts are true and correct and provide a sufficient basis for the Defendant's guilty plea:

1.       ACCELOGIC was a limited liability company originally formed in the State of Delaware on April 8, 2005, that remained registered with the State of Delaware until canceled on April 1, 2017.   ACCELOGIC was owned and operated by Juan Guillermo Gonzalez ("GONZALEZ") and Ana Beatriz Hernandez ("HERNANDEZ").   Although registered in Delaware, ACCELOGIC was located in Broward County, Florida, in the Southern District of Florida from at least as early as May 2005 through the date of the Information.  On November 26, 2008, GONZALEZ, on behalf of ACCELOGIC, filed an application with the Florida Division of Corporations for authorization to transact business in Florida.  On March 27, 2017, GONZALEZ filed Articles of Conversion to convert ACCELOGIC from a Delaware LLC to a Florida LLC.

2.       Intellectual Property Systems, LLC, a/k/a "Intellep" ("INTELLEP") was a limited liability company originally formed in the State of Delaware on April 12, 2001, that remained registered with the State of Delaware until canceled by GONZALEZ on April 1, 2017.  Although registered in Delaware, INTELLEP was located in Broward County, Florida, in the Southern District of Florida from at least as early as May 2005 through the date of the Information.  On January 15, 2009, GONZALEZ, on behalf of INTELLEP, filed an application with the Florida Division of Corporations for authorization to transact business in Florida.  On March 22, 2017, Gonzalez filed Articles of Conversion to convert INTELLEP from a Delaware LLC to a Florida LLC.

3.       Both ACCELOGIC and INTELLEP were originally organized in the State of Delaware, but during all times material to this Information, their principal offices were located in

Broward County, Florida, in the Southern District of Florida, and, in 2017, they filed Articles of Conversion to convert from Delaware limited liability companies to Florida limited liability companies.

4.      The Missile Defense Agency, the United States Air Force, the United States Army, and the Defense Advanced Research Projects Agency ("DARPA") were military services of the United States under the Department of Defense.

5.      The Department of Energy and the National Aeronautics and Space Administration ("NASA") were agencies of the United States.

6.      The Small Business Innovation Research ("SBIR") Program and the Small Business Technology Transfer ("STTR") Program were established by Congress to provide increased opportunities for domestic small businesses to participate in research and development in order to increase employment and improve competitiveness in the United States. The intended purpose of the SBIR and STTR programs was to encourage small U.S. businesses to engage in federal Research and Development ("R&D") that had potential for commercialization. In addition, the STTR program also sought to foster technology transfer through cooperative R&D between small businesses and non-profit research institutions. Through competitive awards-based programs, the SBIR and STTR programs enabled small U.S. businesses to explore their technological potential and provided the incentive to profit from commercialization, while the United States gained entrepreneurial spirit as it met its specific research and development needs. Awards were coordinated through the Small Business Administration.

7.      The SBIR and STTR programs reimbursed for direct labor, direct costs, subcontractors/consultants, overhead, and general and administrative (G&A) costs that were included in an applicant's proposed budget.  In addition, a reasonable fee or profit was available to the company receiving the award under the SBIR or STTR; however, there was a requirement that this fee be included in the budget request, approved by the agencies participating the SBIR and STTR Programs, and normally would not exceed 7% of total costs for each phase of the project.  The profit was intended to be a reasonable profit factor consistent with normal profit margins provided to profit-making firms for R&D work.

8.      Eleven federal agencies participated in the SBIR program, including the Department of Energy, NASA, and the Department of Defense (with its component agencies the United States Army, DARPA, and the Missile Defense Agency).  Each year, the agencies and departments within the SBIR program issued solicitations for research proposals.  In addition to describing the type of research that the agencies and departments were seeking, the solicitations described the basic rules of the SBIR program, including, amongst others, the requirements that: (a) the business be organized for profit, with a place of business located in the United States; (b) the business must be more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States or by other small business concerns that are each more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States; (c) the business have no more than 500 employees; and (d) the R&D occur inside the United States.

9.      Five federal agencies participated in the STTR program, including the Department of Energy, NASA, and the Department of Defense (with its component agencies, including the United States Air Force, the United States Army, DARPA, and the Missile Defense Agency). Each year, the agencies and departments within the STTR program issued solicitations for research proposals. In addition to describing the type of research that the agencies and departments were seeking, the solicitations described the basic rules of the STTR program. The requirements included that: (a) the business be organized for profit, with a place of business located in the United States; (b) the business must be more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States or by other small business concerns that are each more than 50% owned and controlled by one or more individuals who are citizens or permanent resident aliens of the United States; (c) the business have no more than 500 employees; (d) the R&D occur inside the United States; (e) the business must partner with a non-profit research institution; and (f) at least 40% of the R&D must be performed by the business and at least 30% of the work must be performed by the research institution

10.      U.S.-owned small businesses could electronically submit proposals for review to the soliciting SBIR and STTR agencies. Proposals outlined the research that would be conducted and the key personnel who would conduct the research. Proposals also had to include a section identifying the proposed research budget, including all costs (direct and indirect labor, overhead, materials/equipment, and travel) and a Budget Summary that explained allocation of the requested funds to enable the government agency to determine whether the proposed budget was fair and reasonable. Proposals also had to discuss the business's strategy for commercialization; other sources of funding; the location and specifics of the facility and equipment the business would utilize to complete the project; the qualifications of the personnel performing the R&D; and the qualifications and roles of any subcontractors or consultants involved in the project. For STTR proposals, the proposal also had to explain the allocation of R&D between the business and the non-profit research institution.

11.      The awards of the proposals were made by a panel of reviewers, typically comprised of scientists and subject matter experts in various scientific and engineering fields, who scored the proposals based on: (1) the soundness, technical merit, and innovation of the proposed approach and its incremental progress toward the topic under consideration; (2) the qualifications of the proposed/key investigators, supporting staff, and consultants, including not only the ability to perform the research and development, but also the ability to commercialize the results; and (3) the potential for commercial application (which could include intra-government application) and benefits expected to accrue from this commercialization. Based on the panel's ratings, an official of the soliciting agency made the final award decisions. In reviewing and evaluating these proposals, the panel and the soliciting agency official relied on the truthfulness and accuracy of the information contained in the proposals as a basis of awarding the contracts. The scoring difference between the applications could be as small as fractions of a point in some instances; thus ACCELOGIC's statements regarding who would be performing the research, the budget, and the potential for commercialization were material to the reviewers.

12.      Once a proposal was selected and funded for a project by the awarding government agency, some sections of the proposal typically became incorporated into the contract/grant and were used as the statement of work. In addition, a formal contract or grant was physically or digitally signed, setting forth formal terms and conditions for performance and payment, including,

3

amongst other items, restating the requirements that work be performed in the United States by U.S. persons, confidentiality requirements, and performance deadlines. The document was signed by the small business and by a government employee.

13.     In the submission of the proposals, the business was required to certify that all the information included was true and accurate, or to acknowledge, either electronically or in writing, that the small business understood that providing false information in the proposals could result in criminal, civil, or administrative sanctions. The certifications and acknowledgements included the information regarding the budget summary, labor hours, and the personnel and consultants who would be devoted to the contract. Once the contract/grant was awarded, in order to receive payment for work done on a project, the small business was required to request progress payments from the government agency by submitting electronically contractor invoices and/or other government-approved forms. On those forms, the small business typically had to certify that it understood that willfully providing false information or concealment of a material fact in its submissions could result in criminal, civil, or administrative sanctions.

14.     From 2008 through 2021, ACCELOGIC's income came mainly from Small Business Innovation Research Program (SBIR) and Small Business Technology Transfer (STTR) contracts and grants that were funded by federal agencies, including the U.S. Air Force, the U.S. Army, the Defense Advanced Research Projects Agency (DARPA), the Missile Defense Agency (MDA), the Department of Energy (DOE), and the National Aeronautics and Space Administration (NASA).

15.     ACCELOGIC electronically submitted nearly all of its communications, that is, its proposals, invoices, and correspondence regarding the SBIR and STTR contracts and grants, from its offices in Broward County, in the Southern District of Florida. Each of these submissions was a transmission by wire in interstate commerce by virtue of the fact that ACCELOGIC was located in Florida and the government personnel to whom they were submitted were located outside the state of Florida, or they were transmitted via servers located outside the State of Florida.

## AIR FORCE CONTRACT FA9550-09-C-0052

16.     On or about March 26, 2008, ACCELOGIC electronically submitted a research and development proposal to the United States Air Force for a Phase II STTR contract valued at $749,995.88. The R&D proposal was entitled "Algorithm Development for Reconfigurable Computing Architectures." In accordance with the STTR program requirements, ACCELOGIC was proposed as the Small Business that would perform the bulk of the R&D work and that would provide the Principal Investigator. Stanford University was proposed as the non-profit Research Institution with A.J., Ph.D., as Stanford's Team Leader. As part of the proposal, ACCELOGIC agreed that it would continue its research and development of LAPACKrc, a family of FPGA-based linear algebra solvers able to achieve speedups larger than 1,000x with a single chip, and described its four goals as: (1) developing the fundamental RC algorithmic technology for LAPACKrc's high-performance sparse iterative solvers; (2) producing these solvers and their underlying math components as portable and easy-to-use LAPACKrc utilities; and (3) aggressively integrating the LAPACKrc technology (sparse and otherwise) into higher-level solutions to enable the acceleration of PDE problems of high priority to the Air Force. The R&D proposal was

submitted through the DoD Electronic Submission Site at http://www.dodsbir.net/submission/ to the Air Force Research Laboratory in Virginia.

17.     The Air Force solicitation advised in bold type that the Air Force Research Laboratory required all R&D contractors to obtain specific authorization from the contracting officer before allowing any foreign national to participate in or have access to Air Force-sponsored R&D, and that any foreign nationals needed to be specifically identified.

18.     The proposal's detailed budget stated that ACCELOGIC budgeted $502,214.87 total for Direct Labor, Travel, General & Administrative (overhead), and Profit.  The proposal's detailed budget stated that Stanford University, the mandatory Research Institution, budgeted $103,652 during the first year and $106,629 during the second year, for a total of $210,281.  Other listed consultants were budgeted $37,500.

19.     ACCELOGIC and its co-conspirators electronically submitted invoices on or about March 3, 2009; July 10, 2009; January 7, 2010; March 16, 2010; March 9, 2011; and September 25, 2012.  ACCELOGIC received payments on the contract via direct deposit on or about April 23, 2009, August 7, 2009, February 12, 2010, April 16, 2010, April 8, 2011, and October 30, 2012. The invoices and payments totaled $749.996.

## ARMY CONTRACT W911W6-16-C-0007

20.     On or about October 28, 2015, ACCELOGIC submitted a research and development proposal for an SBIR contract with the Army, valued at $159,993.00, entitled "Industrial-Quality Porting of the Army's Helios CFD Code into Xeon-Phi Enabled Systems – A Process-Based Approach for Maximal Speedup."  As part of that R&D proposal, ACCELOGIC agreed that it would complete eight tasks, resulting in ACCELOGIC "port[ing] Helios to Intel-Xeon-Phi-enabled systems and achiev[ing] >20x speed performance increase, the proposed solution will exhibit the same levels of numerical accuracy of the current version of Helios, will be compatible with commercial Xeon-Phi-enabled compilers, and will be portable to run on varied operating systems and hardware architectures, including future generations of Xeon Phi."  The R&D proposal was submitted via the Army's secure SBIR submission portal at https://www.armysbir.army.mil/

21.     As part of its R&D proposal, ACCELOGIC was required to confirm that all R&D work would take place inside the United States and also to disclose whether any Foreign Citizens would work on the project.  ACCELOGIC confirmed that all R&D work would take place at ACCELOGIC's business premises in Florida.  And ACCELOGIC disclosed only one non-U.S. person:  "One of the employees expected to assist in the development of the proposed technology (including algorithms and software prototypes), namely [R.N.], is a Colombian citizen working on H1B status."

22.     Based on its initial budget, ACCELOGIC's costs for Direct Labor, Travel, General & Administrative (overhead), and Profit were calculated as $133,042.81 or 85.8% of the total value of the contract.  In total, consultants were budgeted for $21,950 or 14.2% of the value of the contract.

23.    Relying on the veracity of the statements in ACCELOGIC's proposal, the evaluators selected ACCELOGIC's proposal, and ACCELOGIC engaged in negotiations for the contract.  During those negotiations, GONZALEZ confirmed that all work would be performed in the United States.  The contract, numbered W911W6-16-C-0007, was signed on October 27, 2015, and had an effective date of October 27, 2015.  The contract incorporated by reference the International Traffic in Arms Regulations (ITAR) and Export Administration Act of 1979 (EAR) restrictions on using foreign nationals and not allowing work outside the United States.

24.    In connection with this contract, ACCELOGIC electronically submitted invoices totaling $149,992.81, and, from July 1, 2016 through November 10, 2017, ACCELOGIC received eight payments via direct deposit from the government totaling $149,992.81.

## ARMY CONTRACT W911W6-17-C-0026

25.    On or about November 16, 2016, ACCELOGIC submitted a research and development proposal for a Phase II SBIR contract with the Army, valued at $1,009,988.34, entitled "Industrial-Quality Porting of the Army's Helios CFD Code into Xeon-Phi Enabled Systems – A Process-Based Approach for Maximal Speedup."  As part of that R&D proposal, ACCELOGIC agreed that it would complete eight tasks, resulting in ACCELOGIC demonstrating "larger than 10x speedup for the entire Helios code, without sacrificing its industrial quality or its numerical integrity.  By the end of Phase II, we will transition the resulting software and utilities into the Army's Helios program."  The R&D proposal was submitted via the Army's secure SBIR submission portal at https://www.armysbir.army.mil/

26.    As part of its R&D proposal, ACCELOGIC was required to confirm that all R&D work would take place inside the United States and also to disclose whether any Foreign Citizens would work on the project.  In the introductory question portion of the proposal, GONZALEZ, on behalf of ACCELOGIC, disclosed that ACCELOGIC was proposing to use foreign nationals for work under the proposed effort, but did not disclose who the foreign national(s) were.  In the proposal, the Defendant acknowledged that security was a concern for the Army in connection with its Helios code, and disclosed a single foreign national, R.N.

27.    In its detailed two-year budget, ACCELOGIC budgeted $460,989.92 for Direct Labor costs of its named and unnamed employees.  ACCELOGIC also promised that it would use the same Consultants that it had proposed but had not used in Phase I, and budgeted $52,580, or 5.2% of the value of the contract, for the consultants.

28.    Relying on the veracity of the statements in ACCELOGIC's proposal, the evaluators selected ACCELOGIC's proposal, and ACCELOGIC engaged in negotiations for the contract.  During those negotiations, GONZALEZ signed a Certification confirming that all research/research and development work would be performed in the United States at ACCELOGIC's business premises; that one non-U.S. persons would work on the contract; and that all information contained in ACCELOGIC's application was true and correct.  The Certification informed GONZALEZ and ACCELOGIC that intentional misrepresentations could result in criminal sanctions.  The contract, numbered W911W6-17-C-0026, was signed by HERNANDEZ on September 26, 2017, and had an effective date of September 26, 2017.

29.     Under the terms of the contract, ACCELOGIC was to produce and submit electronically seven Quarterly Reports and a Final Report within two years, on 12/30/2017, 3/31/2018, 6/30/2018, 9/30/2018, 12/30/2018, 3/30/2019, 6/30/2019, and 9/24/2019. After missing several deadlines, ACCELOGIC asked for and received a modification of the contract "due to [ACCELOGIC's] inability to complete the work per the contract [to] change the Period of Performance end date of Sep 2019 (basic contract) to Oct 2020 (this mod)." The modification was signed on May 8, 2019.

30.     Despite asking for and receiving an extension of time to complete its work, ACCELOGIC did not complete the work promised under the contract. It electronically submitted only two reports and two invoices.

31.     Accelogic received two payments on the contract via direct deposit on March 19, 2019, and April 9, 2019. The payments totaled $249,994.18.

## DARPA CONTRACT IND17PC00012

32.     On or about April 29, 2016, ACCELOGIC submitted a research and development proposal for a Phase II SBIR contract with DARPA, valued at $1,510,000, entitled "Enabling Extreme Acceleration of Graph Analytics in Real-World Applications." As part of that R&D proposal, ACCELOGIC agreed that it would complete seventeen tasks, resulting in ACCELOGIC implementing "a revolutionary technology that will change the paradigm of how network analysis in cybersecurity is done today." ACCELOGIC proposed to create an accelerated STINGER prototype, followed by an accelerated Neo4j prototype, and lastly a proprietary software prototype named "SOCnow" (for "Security Operations Center now"). The R&D proposal was submitted via the DoD's secure SBIR submission portal at https://sbir.defensebusiness.org/

33.     As part of its R&D proposal, ACCELOGIC was required to confirm that all research/research and development work would take place inside the United States and also to disclose whether any Foreign Citizens would work on the project. GONZALEZ, on behalf of ACCELOGIC, disclosed only one foreign citizen—S.F.—and did not disclose any plan to conduct any work outside the United States.

34.     The Proposal's detailed budget stated that six academic consultants would work on the two-year base project, and $120,800 was budgeted for consultants. In addition to estimating the number of hours that each consultant would work each year, the Proposal also split the entire three-year project into 20 tasks over 12 quarters. The proposal listed specific assigned tasks during particular quarters for the consultants. Some consultants were assigned only a few tasks, while others were assigned to almost all.

35.     In addition to consultants, ACCELOGIC budgeted $307,149 in Direct Labor costs for 5 employees.

36.     Relying on the veracity of the statements in ACCELOGIC's proposal, the evaluators selected ACCELOGIC's proposal for award. In the award notification letter, which was addressed to GONZALEZ, DARPA reminded GONZALEZ and ACCELOGIC that "the International Traffic in Arms Regulations (ITAR), 22 CFR Parts 120 through 130, and the Export

Administration Regulations (EAR), 15 CFR Parts 730 through 799, will apply to all projects with military or dual-use applications that develop beyond fundamental research . . . If use of foreign citizens has been proposed, you must be able to specify their country of origin, the type of visa or work permit under which they are performing and an explanation of their anticipated level of involvement on this project."

37.     The Defendant engaged in negotiations for the contract.  The contract, numbered IND17PC00012, was signed on October 24, 2016, and had an effective date of October 24, 2016. The contract specified that prior approval from the Contracting Officer was required before using any foreign national as an employee or a subcontractor to do any work on the contract and that the contract had a "Buy American" clause that required ACCELOGIC to use American-made equipment and products.  The contract required prior approval from DARPA for the dissemination or publication of information developed under the contract outside of ACCELOGIC.  The contract further specified ACCELOGIC's obligations with regard to the U.S. export control laws and regulations, including ITAR and EAR.  During those negotiations, the Defendant confirmed that all R&D work on the contract would be performed inside the United States at ACCELOGIC's business premises and in accordance with the Statement of Work contained in ACCELOGIC's R&D proposal.

38.     Although the contract required ACCELOGIC to complete its performance by 2019, and although ACCELOGIC promised to use the funding from INTELLEP to avoid delays, ACCELOGIC asked for and received several extensions of time to complete its research but did not complete its work.  In connection with this contract, ACCELOGIC electronically submitted eight invoices totaling $796,666.67 and received payments from the government totaling $796,666.67.

## MDA CONTRACT HQ014718C7211

39.     On or about June 21, 2017, ACCELOGIC submitted a research and development proposal for a Phase I SBIR contract with the MDA, valued at $154,987.86, entitled "Industrial-Quality Acceleration of MDA's Missile Defense Simulation Infrastructures – A Novel Theory of Optimal Data Compression Inspired on the OSF."  As part of that R&D proposal, ACCELOGIC agreed that it would "establish for the first time the revolutionary theory of 'speedup centric' optimal compression . . . along with a powerful battery of novel OSF-inspired compression methods and implementation innovations necessary for substantially accelerating the performance of MDA's Objective Simulation Framework (OSF) through data compression."  ACCELOGIC promised to prepare a fully functional prototype addressing both real-time and file-transfer operation modes in OSF simulations, relying on synthetic and publicly available data, as well as OSF sample datasets promised by defense contractor by Teledyne that involved confidential government information.  ACCELOGIC uploaded its R&D proposal via the DoD SBIR/STTR Proposal Submission system, available at https://sbir.defensebusiness.org

40.     As part of its R&D proposal, ACCELOGIC was required to confirm that all research/research and development work would take place inside the United States.  ACCELOGIC stated that all work would be performed at ACCELOGIC's offices in Weston, Florida.

41.     ACCELOGIC's proposed detailed budget allocated $63,571.50 for ACCELOGIC Direct Labor costs, and $21,025 was allocated for outside consultants.

42.     Relying on the veracity of the statements in ACCELOGIC's proposal, the evaluators selected ACCELOGIC's proposal, and GONZALEZ engaged in negotiations for the contract on behalf of ACCELOGIC.  During those negotiations, GONZALEZ signed a written certification—that warned him of criminal penalties for false statements—that all research/research and development work  would be performed in the United States; all work would be performed at ACCELOGIC's facilities with ACCELOGIC's employees (except as otherwise identified in the proposal); and that all information contained in the proposal was true and correct as of the date of the award.

43.     ACCELOGIC disclosed that three non-U.S. citizens would work on the contract – GONZALEZ, R.N., and S.F.   In ACCELOGIC's disclosure regarding Foreign Persons, ACCELOGIC stated that GONZALEZ "**has worked with (and contributed to) export controlled/ITAR software, such as DoD's HPCMP CREATE-AV CartP software (advanced rotorcraft modeling and simulation) as well as NASA's CART3D, FUN3d, and TetrUSS codes (aerodynamic analysis and simulation).  As such, Dr. Gonzalez and his team at Accelogic are well trained on export control laws and regulations.**"  (Emphasis in original). ACCELOGIC further stated that S.F. was a "U.S. Permanent Resident."  At the time, S.F. was not a U.S. Permanent resident and ACCELOGIC had, in truth and in fact, applied for an H1B visa on S.F.'s behalf.  ACCELOGIC further stated that no other non-U.S. persons would work on the contract.  MDA approved GONZALEZ's and R.N.'s work on the MDA project.  On October 11, 2017, MDA informed ACCELOGIC that because the contract could produce export control information, S.F. was not authorized to perform work on the contract.  On the same day, GONZALEZ responded to MDA stating that ACCELOGIC would remove S.F. from the project and stating that HERNANDEZ would perform the work instead.  In truth and in fact, HERNANDEZ did not perform any R&D work on the project; instead, S.F. continued to work as one of the main participants on the project. To allow S.F. to conduct his R&D work, ACCELOGIC and its co-conspirators gave S.F. unauthorized access to MDA's technical data despite MDA's specific notice that such access was unauthorized.  S.F. knew that he did not have permission from the MDA to access the MDA's secure file-sharing platform, yet he accessed the platform to obtain the datasets and other government information without authorization.

44.     GONZALEZ, on behalf of ACCELOGIC, also completed a Certification Pertaining to Foreign Interests on behalf of ACCELOGIC and stated that ACCELOGIC did not own 10 percent or more of any foreign interest; and that ACCELOGIC "does not have any contracts, agreements, understandings, arrangements, indebtedness, liabilities or obligations with any other foreign person."  GONZALEZ further wrote that three individuals, including J.P., "provide occasional hourly-based consulting to ACCELOGIC on advanced technical aspects" but stated that none of those individuals – including J.P. – would work on the project with MDA. ACCELOGIC did not disclose that J.P. owned and worked for Merida Tech and that Merida Tech would, in fact, work on the MDA project.

45.     The contract also contained a provision stating that distribution of any technical documents (which is defined to include recorded information and software that conveys scientific and technical information and technical data) prepared under the SBIR contract, in any state of

development or completion, was prohibited outside of the contractor and applicable subcontractors under the contract unless authorized by the Contracting Officer in writing.  The contract also notified ACCELOGIC that all technical documents prepared under the Contract needed to be marked with the following:

> WARNING:  This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979 (Title 50, U.S.C., App. 2401 et seq), as amended. Violations of these export laws are subject to severe criminal penalties. Disseminate in accordance with provisions of DoD Directive 5230.25.

46.     Despite GONZALEZ's representations and the specific notifications from MDA regarding the sensitive nature of the project and the prohibitions on involvement of non-U.S. persons and requirement that all work occur inside the United States, ACCELOGIC involved Merida Tech and J.P. in the MDA project.

47.     In early December 2017, GONZALEZ traveled to Venezuela via Colombia to meet with J.P. and other Merida Tech employees.  GONZALEZ brought computer equipment and information about the MDA project with him and shared that information with J.P. and other Merida Tech employees without authorization from MDA.  GONZALEZ returned to the United States on December 12, 2017, en route to a meeting about the project at MDA on December 13, 2017.  When encountered by Customs & Border Protection Officers at the Houston airport upon re-entering the United States, GONZALEZ admitted to contracting software jobs with Merida Tech, but he never disclosed that information to MDA or any other SBIR or STTR agency.

48.     On or about April 17, 2018, ACCELOGIC and its co-conspirators electronically submitted an invoice to MDA for $30,000.  On or about May 10, 2018, ACCELOGIC received a payment from the government for $30,000 based upon its invoice.  ACCELOGIC received other payments related to the contract totaling $69,992.32.

## NASA CONTRACT NNX16CA11C (PHASE II)

49.     On or about January 28, 2015, ACCELOGIC submitted a Phase I research and development proposal for an SBIR contract with NASA, entitled "Accelerating Memory-Access-Limited HPC Applications via Novel Fast Data Compression."  As part of that R&D proposal, ACCELOGIC agreed that it would demonstrate that it is possible to "develop and implement the fundamental theory and methods necessary for accelerating memory-bound NASA HPC applications through the use of novel aggressive compression techniques . . . [and] demonstrate that, in addition to infusing high performance, the methods developed will be 'easy to infuse' . . . into an existing code."  ACCELOGIC further promised that its resulting technology would support the creation of memory compression components for the first numerical library optimized for intelligent use of memory bandwidth resources in HPC.

50.     After completing the Phase I contract, on or about December 17, 2015, ACCELOGIC submitted a Phase II R&D proposal for an SBIR contract with NASA, valued at $755,000, entitled "Accelerating Memory-Access-Limited HPC Applications via Novel Fast Data Compression."  As part of that R&D proposal, ACCELOGIC agreed to "move boldly into tackling

the acceleration of a real-life high-profile code, namely NASA's Cart3D, improving its performance by a paradigm-shifting 2x to 4x end-to-end wall-clock time acceleration by the end of Phase II." ACCELOGIC also agreed to "accommodate Cart3D to become 'future-machines-ready,' such that the resulting code [could] easily be ported to the imminent HPC computer architectures of the following decade." Lastly, ACCELOGIC also proposed to "inject[] a second NASA code with basic Compressive Computing techniques, and provid[e] it with base levels of acceleration of ~1.3-2x."

51.     ACCELOGIC's Phase II R&D work plan contained three objectives: (1) full optimization of ACCELOGIC's compressive computing in NASA's Cart3D software; (2) developing data reordering solutions to improve compression; and (3) developing data structure revamping solutions to improve vectorization and implement lossy compression schemes and arithmetic pruning to make Cart3D (or other NASA software programs) more amenable to compression. ACCELOGIC also proposed to accelerate a second top HPC NASA code, including packaging and extensions.

52.     As part of its R&D proposal, ACCELOGIC was required to confirm that all R&D work would take place inside the United States; to disclose all subcontractors and consultants who would work on the contract; and to confirm that the contract would be performed in accordance with ITAR export control regulations. GONZALEZ, on behalf of ACCELOGIC, confirmed that all R&D work would take place at ACCELOGIC's business premises in the United States and in accordance with ITAR export control regulations. And GONZALEZ, on behalf of ACCELOGIC, disclosed several consultants, but made no mention of Merida Tech, its owner, J.P., or any of its employees. GONZALEZ, on behalf of ACCELOGIC, certified that the information provided in the application and other documents submitted was true and correct and that false statements could expose him to criminal and civil penalties.

53.     The proposal's detailed budget stated that Direct Labor by ACCELOGIC's employees was budgeted for $345,344, and consultants were budgeted for $50,500 for their work on the contract.

54.     Relying on the veracity of the statements in ACCELOGIC's R&D proposal, the evaluators selected ACCELOGIC's R&D proposal, and ACCELOGIC engaged in negotiations for the contract. During those negotiations, GONZALEZ confirmed that all R&D work would be performed inside the United States at ACCELOGIC's business premises and in accordance with the Statement of Work contained in ACCELOGIC's R&D proposal. The contract, numbered NNX16CA11C, was signed on April 27, 2016, and had an effective date of April 27, 2016. The contract had a number of specifications requiring ACCELOGIC to notify NASA prior to engaging any subcontractors or making any changes to the list of personnel who would work on the contract or the facilities where the work would be performed. The contract also contained additional notices regarding ITAR and EAR. GONZALEZ, on behalf of ACCELOGIC, also agreed that he had read and agreed to NASA's IT Security Management Plan.

55.     As part of the negotiation, ACCELOGIC had to identify the unnamed "Software Engineers" who were listed in the proposal. GONZALEZ reported that HERNANDEZ and S.F. would be the two software engineers to work on the contract. In particular, GONZALEZ falsely stated to NASA that HERNANDEZ would perform 480 hours of work on the contract and would

work on developing the prototypes called for by the proposal. Also during the negotiation, GONZALEZ re-certified that all research would be conducted in the United States at ACCELOGIC's facility in Weston, Florida, and that all of the proposed consultants would be utilized on the project.

56.     The contract, numbered NNX16CA11C, was signed on April 27, 2016, with an effective date of April 27, 2016, and called for the project to be completed in 24 months, that is, by April 27, 2018.

57.     ACCELOGIC electronically submitted to NASA several invoices, certifications, and Reports, but never disclosed in any of these reports that it was using non-U.S. persons to conduct R&D; that it was conducting R&D outside the United States; that it was not using the consultants or one of the employees listed in the proposal and budget provided during the contract negotiations. The contract had to be modified at ACCELOGIC's request on several occasions to extend the time for ACCELOGIC to complete its work.

58.     ACCELOGIC received eight payments on the contract via direct deposit from August 29, 2016 through June 10, 2020, totaling $703,125.

## DEPARTMENT OF ENERGY CONTRACT DE-SC0018521 (PHASE I)

59.     On or about December 2, 2017, ACCELOGIC submitted a Phase I research and development proposal for an SBIR grant with the Department of Energy, valued at $153,218, entitled "Next-Generation Technology for the Extremely Efficient Storage, Distribution, and Processing of Nuclear Physics Data." As part of that R&D proposal, ACCELOGIC agreed to provide a feasibility demonstration of "the ground-breaking data compression technology able to multiply the capacity of existing (and future) last-mile 'live storage' facilities by factors larger than 4x and up to 9x without any additional investment in hardware. The technology, which will be packaged as an open-source set of tools, will be integrated with ROOT/IO and will provide the users with full control in the form of easy to understand/use/modify/adapt according to the specific needs and technical sophistication of each user."

60.     ACCELOGIC's Phase I work plan contained three stages, consisting of a barebones prototype; a fully functional prototype; and comprehensive validation.

61.     As part of its R&D proposal, ACCELOGIC was required to certify all statements and confirm that the statements were true, complete, and accurate, and to acknowledge that false statements could subject the signing party to criminal, civil, or administrative penalties. GONZALEZ, on behalf of ACCELOGIC, certified and confirmed that all R&D work would "be performed in its entirety in the United States" at ACCELOGIC's business premises or at Brookhaven National Laboratory and in accordance with ITAR export control regulations. GONZALEZ, on behalf of ACCELOGIC, also stated that the project did *not* "involve activities outside of the United States or partnerships with international collaborators."

62.     ACCELOGIC's proposed detailed budget allocated $87,345.40 for ACCELOGIC's Direct Labor costs and $10,725 for four expert consultants.

63.     Relying on the veracity of the statements in ACCELOGIC's R&D proposal, the evaluators selected ACCELOGIC's proposal, and the Defendant engaged in negotiations for the contract.  During those negotiations, GONZALEZ re-certified that all R&D work would be performed inside the United States, resulting in a CounterIntelligence Review finding that the "application did not show a connection to a foreign country found on the DOE sensitive countries list."  The contract numbered DE-SC0018521 was signed on April 6, 2018, with an effective date of April 6, 2018, and the project was to be completed between April 9, 2018, and January 9, 2019.

64.     In connection with this contract, ACCELOGIC electronically submitted one final report and received payments from the government totaling $153,218.

## MATERIAL MISSTATEMENTS AND DISTRIBUTION OF PROCEEDS

65.     In each of these seven R&D proposals, ACCELOGIC and its co-conspirators made material misrepresentations regarding the persons who would work on the contract and how the costs would be allocated in order to mislead the agencies and secure the contracts.  ACCELOGIC and its co-conspirators touted the experience and expertise of the consultants who were budgeted to work on the contracts, promising a "world-class combination of experts," a "team carefully assembled for successfully tackling the challenges of the project," a "world-class multidisciplinary team of experts . . . put together to guarantee the success of this project," "an unmatched world class team," and "world class talent and expertise."  Individual consultants were referred to as "a world authority on high-performance parallel software," "globally known . . . in High Performance processing with Xeon and Xeon Phi processors," "author of STINGER graph and a world authority on streaming graphs and cyber security applications," "one of the most renowned scientists in Computer Science," "a world leader in compression of floating point data," "one of the fathers of data compression."  ACCELOGIC and its co-conspirators made these statements in order to lead the proposal reviewers to believe that the industry-leading consultants would be integral parts of the research and development that ACCELOGIC would conduct.

66.     In each of these seven R&D proposals, ACCELOGIC and its co-conspirators also materially misrepresented the ACCELOGIC employees who would work on the contracts.  Instead of stating that nearly all work on the contract would be performed by GONZALEZ and two or three other employees, ACCELOGIC's proposals included personnel listed only by position—to be funded at thousands of dollars—that appeared as though ACCELOGIC already had filled the position or would be recruiting to fill the position—for example, $63,910 for a "Research Engineer," $63,888 for a "Software Engineer I," two "Software Engineers" at $57,200 each, and two "Software Engineers" at $70,000 each.  ACCELOGIC and its co-conspirators made these statements in order to lead the proposal reviewers to believe that ACCELOGIC had the personnel necessary to complete the research and development within the timeframe set by the contract.

67.     Specifically with respect to the Air Force STTR proposal and contract, which required partnering with the designated Research Institution, Stanford University, ACCELOGIC and its co-conspirators made material misrepresentations and omissions in its R&D proposal, Status Reports, and Final Reports.  Rather than use the employees and consultants specified in the proposal to complete the work within the two-year timeframe permitted by the contract, ACCELOGIC and its co-conspirators performed all of the work at ACCELOGIC, and used foreign nationals, who were not disclosed in the R&D proposal or pre-approved.  In direct contravention

of the STTR's term requiring that the non-profit research institution perform at least 30% of the R&D, ACCELOGIC failed to coordinate with Stanford and provided none of the funds received from the Air Force to Stanford University.

68.    In several of these seven R&D proposals, and related contract reports and certifications, ACCELOGIC and its co-conspirators also made material misrepresentations and omissions regarding the use of non-U.S. persons in conducting its research/research and development and made material misrepresentations and omissions about performing all research/research and development within the United States at ACCELOGIC's premises. ACCELOGIC and its co-conspirators repeatedly stated or certified that all work would be performed inside the United States at ACCELOGIC's premises, and, also for some contracts and certain types of work, that such work would be performed by U.S. persons. The reasons for these statements/certifications varied depending on the contract, and included the confidential nature of some research, ITAR and EAR restrictions, signed software license agreements, and/or the stated purpose of the SBIR/STTR programs, which was to enhance American entrepreneurship. In one instance, ACCELOGIC disclosed an intent to use a non-U.S. person, and the agency specifically objected, and ACCELOGIC and its co-conspirators affirmatively stated that the non-U.S. person would be replaced with a U.S. citizen.   Despite the written agreements and warnings, ACCELOGIC and its co-conspirators, allowed non-U.S. persons who were ACCELOGIC employees, and the foreign owner and foreign employees of Merida Tech, a business located in Venezuela, to access the government software and information and to perform research and development work related to the contracts, including work on software optimization, creation of software scripts, and validation/performance reports.

69.    In several of these seven R&D proposals, ACCELOGIC and its co-conspirators made material misrepresentations regarding ACCELOGIC's ability to timely complete its work and commercialize its technology in order to mislead the agencies and secure the contracts. ACCELOGIC and its co-conspirators: (a) falsely overstated the number of patents that ACCELOGIC had received based upon prior SBIR/STTR work; (b) falsely overstated the amount of funds ACCELOGIC earned from sources other than SBIR/STTR work; and (c) falsely overstated the number of people ACCELOGIC employed.

70.    In several of these seven R&D proposals, ACCELOGIC and its co-conspirators made material misrepresentations regarding ACCELOGIC's ability to timely complete its work and commercialize its technology in order to mislead the agencies and secure the contracts. ACCELOGIC and its co-conspirators submitted letters on INTELLEP letterhead that made it appear that INTELLEP's Board of Directors had formally met, independently reviewed ACCELOGIC's written SBIR/STTR proposals, and formally voted to commit significant funding – between $100,000 and $750,000 per proposal – to support ACCELOGIC's completion of the research and commercialization of the technology, without disclosing that GONZALEZ and HERNANDEZ were the married co-owners of ACCELOGIC and INTELLEP, were employed by ACCELOGIC and INTELLEP, and would be receiving funds from the contracts, if awarded. The letters also failed to disclose that INTELLEP's funding came from other fraudulently-obtained SBIR/STTR contract payments from ACCELOGIC to GONZALEZ and HERNANDEZ as salaries or revenue-sharing based on their ownership of ACCELOGIC.

14

71.     By not using consultants named in the R&D proposals, by not hiring additional employees listed in the R&D proposals, and by not making the full investments promised by INTELLEP, among other factors, ACCELOGIC and its co-conspirators were unable to complete the contracts within the time frames promised in their original proposals.

72.     Also, by not using the proposed list of consultants and additional employees listed in the proposals, ACCELOGIC and its co-conspirators kept the additional funds originally allocated in the contracts for salaries and consulting fees. Those funds were distributed amongst ACCELOGIC and its co-conspirators, including GONZALEZ and HERNANDEZ, in the form of salaries or revenue-sharing based upon their ownership of ACCELOGIC.

The United States and the Defendant agree that these facts, which do not include all of the facts known to the United States and to the Defendant, are sufficient to prove the guilt of the Defendant as to the crime of conspiracy to commit wire fraud, that is, to knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and, for the purpose of executing such scheme, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; all in violation of Title 18, United States Code, Section 1349.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

Date: 6/22/2022          By: _____
                             A. MARIE VILLAFAÑA
                             ASSISTANT UNITED STATES ATTORNEY

Date: 6/22/22            By: _____
                             PETER ZEIDENBERG, ESQ.
                             ATTORNEY FOR DEFENDANT

Date: 6/22/2022          By: _____
                             ANA BEATRIZ HERNANDEZ
                             MANAGING MEMBER
                             ACCELOGIC LLC

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-CR-80080-CANNON/REINHART**

**UNITED STATES OF AMERICA**

**vs.**

**ACCELOGIC LLC,**

              **Defendant.**
_____/

**FORFEITURE STIPULATION AND AGREEMENT ON INTELLECTUAL PROPERTY**

    The United States of America (the "United States"), by and through the undersigned

Assistant United States Attorneys, and ACCELOGIC LLC, (the Defendant) with undersigned

counsel, (collectively, the "Parties") hereby stipulate and agree as follows:

    1.    The Parties agree to resolve certain forfeiture concerns consistent with the sound

policy favoring settlement of legal disputes without resort to unnecessary litigation.

    2.    The Court has jurisdiction over the Parties and the subject matter of this Forfeiture

Stipulation and Agreement (the "Agreement").

    3.    The Agreement is incorporated into the Plea Agreement, and therefore subject to

the approval by the Court, and a violation of any term or condition shall be construed as a violation

of the Plea Agreement.

    4.    In the Plea Agreement, the Defendant agreed to the entry of a forfeiture money

judgment in the amount of $2,902,984.98 in U.S. currency.

    5.    The Government has identified as substitute assets the following intellectual

property (the Property):

a.  U.S. Patent No. 10,305,980;
b.  U.S. Patent No. 10,114,554;
c.  U.S. Patent No. 10,965,744;
d.  U.S. Patent No. 7,849,126.

6.      The Defendant wishes to pursue the opportunity to retain the Property. The Parties hereby agree that within 45 days of entry of the Defendant's guilty plea, the Defendant may retain a private appraiser for appraisal of the current fair market value of the Property, subject to approval by the United States in advance. If the Parties cannot agree on the appraiser, the Court shall decide. This appraisal shall be done at the Defendant's own expense. Any appraisal must be completed no later than 60 days following the Defendant's sentencing.

7.      In lieu of forfeiture of the Property by the United States, the Defendant may make a payment in the amount of the current fair market value of the Property towards the outstanding balance of the forfeiture money judgment entered against the Defendant (the Settlement Payment).

8.      The Defendant agrees to sign an affidavit under penalty of perjury attesting that the Settlement Payment is derived from a legitimate source and agrees to attach proof of the source of funds to such affidavit.

9.      If the Settlement Payment is not remitted to the United States within 120 days of receipt of the valuation, the Defendant consents to the final forfeiture of the Property, and the property may be sold by the United States Marshals Service.

10.     The United States Marshals Service may, but is not required to, use the appraisal provided by the Defendant.

11.     In exchange for the Settlement Payment, the Government agrees to release from forfeiture proceedings the Property.

12.     The Settlement Payment shall be applied towards the outstanding balance of the Defendant's forfeiture money judgment.

13.     This Agreement does not release the Defendant from the obligation to pay the outstanding balance of the Defendant's forfeiture money judgment.  Income to the Defendant from work concerning the Property, such as from licensing or future sales of the Property for an amount that exceeds the Settlement Payment, is not released.

14.     Nothing in this Agreement shall be construed to prohibit the Defendant from selling or licensing the Property after the Defendant remits the Settlement Payment described in paragraph 7.

15.     The Defendant agrees that if a determination is made to file for bankruptcy under Chapter 7 or Chapter 11 of the Bankruptcy Code, it shall notice the United States Attorney's Office for the Southern District of Florida no less than thirty (30) days before so filing.

16.     The Defendant shall not commit nor allow any act to be done to diminish or otherwise alter the value of the Property.  The Defendant hereby agrees that it will not take any action to encumber, transfer, dispose of or cloud the title to the Property until such payment is made to the United States.  The Defendant further agrees that it shall continue to be responsible for all registrations, fees, liens, and other maintenance, claims, and encumbrances against the Property until such payment is made.

17.     The parties further agree that the Settlement Payment shall be made via Electronic Funds Transfer to the United States Marshals Service, in United States currency, with instructions to be provided by the United States Attorney's Office.

18.     If property is forfeited and restoration is appropriate in this case, the U.S. Attorney's Office agrees to make a non-binding request to the Chief of Money Laundering and Asset Recovery Section (MLARS), Criminal Division, U.S. Department of Justice, that any property obtained from the Defendant through forfeiture be applied to any restitution ordered by the Court and distributed to the

victims of the offense in accordance with any restitution order entered in this case.  The Defendant understands the decision to apply forfeited funds in this way is in the sole discretion of MLARS and that neither the U.S. Attorney's Office nor MLARS made any promises about whether it will grant this request.  The Defendant understands that if this request is denied, the Defendant will be liable to pay restitution and forfeiture pursuant to the Plea Agreement.  The Defendant understands that forfeiture and restitution are separate obligations and that the Court does not have the authority to offset them against each other.

19.     The undersigned counsel hereby represents he has reviewed and discussed the Agreement with the Defendant and has advised the Defendant that the terms of the Agreement are in its best interests.

20.     Each of the Parties agrees to bear its own costs and attorney's fees.

21.     The Defendant has read and fully understands each provision of the Agreement, and has freely and voluntarily signed the Agreement.

22.     The Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.

[Remainder of page intentionally left blank.]

23.     The Agreement contains the entire agreement between the Parties.


FOR DEFENDANT:


6/22/2022
Date                          _____
                              Ana Beatriz Hernandez
                              Managing Member, Accelogic LLC


6/22/2022
Date                          _____
                              Peter Zeidenberg
                              Counsel for Accelogic LLC


FOR THE UNITED STATES OF AMERICA:

                              JUAN ANTONIO GONZALEZ
                              UNITED STATES ATTORNEY


6/22/2022
Date                          _____
                              A. Marie Villafaña
                              Gabrielle Raemy Charest-Turken
                              Assistant United States Attorneys


5